Demczak, Appellant, *v.* Demczak.

Argued April 18, 1955. Before RHODES, P. J., HIRT, ROSS, GUNTHER, WRIGHT, WOODSIDE, and ERVIN, JJ.

*Francis Taptich,* for appellant.

*Henry Mustin,* with him *Franklyn E. Conflenti,* for appellee.

Opinion by Woodside, J., July 21, 1955:

This is an appeal from the decree of the Court of Common Pleas of Allegheny County granting a divorce to a husband on the ground of desertion.

There are no complicated legal or factual questions involved.

The master filed a report in which he carefully analyzed and reviewed the testimony, and Judge Alpern filed a comprehensive opinion in which she thoroughly disposed of all the questions raised. We have made an independent examination of the record, and agree with the master and the lower court that the divorce should be granted.

The plaintiff alleged in his complaint that the wife was guilty of desertion and indignities. The master concluded that the evidence did not support the charge of indignities, but recommended granting the divorce on the ground of desertion.

The parties were married February 18, 1950 in Glendale, and went to live at the home of the husband's parents in Carnegie. Their living arrangements were unsatisfactory as they had to share their bedroom with the plaintiff's two adult brothers, who, although usually not occupying the room at the same time as the married couple, on occasions did sleep there simultaneously with them.

During the first thirteen months of their marriage, the wife left her husband eight or ten times, finally telling him on March 17, 1951, that she would not return until he found a suitable place to live.

On April 15, 1951 the plaintiff found a two room apartment at 1806 Washington Street, Heidelberg, which was satisfactory to the defendant, and which he rented. Together, the parties painted their rooms, purchased new furniture and obtained curtains, bedspreads, dishes and similar household equipment.

About May 13, 1951 the premises were ready for occupancy. In the meantime they had not lived in the apartment, but had had intercourse there, as a result of which the wife became pregnant.

When all the furniture except the refrigerator and the washing machine had arrived the plaintiff brought some of his clothing to the apartment and suggested they go for defendant's clothing and start living there. She refused. She gave as her reason that "He said, 'We'll go to your house for your clothes and bring them up here and you stay up here and then I will go home to get dressed' . . . He meant always, sir. He meant that I should stay there in the day and night and I wasn't even permitted to see my mother. I was to stay there day and night and he was to go to his mother for his care, for his breakfast and also for his clothes and also for his car . . . (I left) because I seen it was just like all other times."

The plaintiff testified, "She was there (at the apartment) one day before I finished work and when I came up to do some little work there that had to be done she started an argument with me, that I was mistreating her. She just said she was going to leave and that was the last time I seen her up there."

The landlady testified that defendant came up to get her things like dishes and dusters, curtains and bedspreads and told her, "she was taking all her things because she absolutely refused to live with him. She didn't say why but just wouldn't live with him."

The husband continued to pay the rent for more than a year during which time he made numerous attempts to persuade his wife to come and live with him. She made various excuses, all of which taken together, clearly indicate she had no intention or desire to continue the marital relationship.

As Judge ALPERN said, "The actions of the wife are not those of one who wanted to continue marital relationship but rather, the actions of a wife who wanted to terminate her marriage."

A child was born to the couple on February 5, 1952. According to the uncontradicted testimony, the husband did not know his child was born until four days later when he was told by some friends. When he went to see his wife at the hospital he was permitted to see the baby but the wife refused to see him. When he offered financial help she refused to accept it saying her mother and she would rear the child. (She subsequently sought and obtained a court order.)

The master concluded the wife was justified in leaving the plaintiff's parents home, but she was not justified in failing to resume marital relations with her husband when the separate quarters were rented and prepared for occupancy.

It was argued before us that the wife offered to resume marital relations within the statutory period of two years and that the husband refused to accept the offer.

She has the burden of proving by clear and convincing evidence that she made a bona fide offer of reconciliation. *Clark v. Clark*, 172 Pa. Superior Ct. 5, 92 A. 2d 236 (1952).

To establish her offer to resume marital relations the appellant relies primarily upon the testimony of her sister who said that in May 1952 plaintiff called on her to inquire about his wife's physical condition, and that she (the sister) said "Margie wanted to go back" and he said, "Well I'll have to think about it." She further testified that in January 1953 she called him on the telephone and said, "Margie wanted to go back," and "He said, 'Well up to date it has cost him quite a lot of money' and he told her to call him. Well,

she called and she never got in touch with him. He said he didn't think he was going to call but he would wait a few months and then he would do something about it."

In *Helm v. Helm,* 143 Pa. Superior Ct. 22, 25, 17 A. 2d 758 (1940) the late President Judge KELLER said, ". . . when the law speaks of a bona fide offer of reconciliation and return made by a deserting wife (or husband), it does not contemplate a cold, formal offer, made on behalf of the *guilty party* by her *attorney*, to go back and live with her husband, but an honest and sincere *request made by her to her husband* to take her back and resume marital relations, resulting from a real regret for having left him: (Citing)."

As stated in the opinion of the lower court: "The offer made by the wife's sister in behalf of the wife was not such an offer as meets the requirements of the law for reconciliation. The husband had made it clear to the sister that he would not call his wife and intimated that she could call him. He made it clear also that he would do nothing for several months, and he did nothing for several months. The way was open to the wife for reconciliation, but no effort was made."

The wife resided in the same vicinity as her husband. There is little doubt that she could have contacted him personally had she made a genuine and sincere effort to do so.

After making numerous efforts to have his wife return to him, plaintiff was justified in saying to his sister-in-law that it was his wife's turn to demonstrate her good faith by contacting him.

A reading of all the testimony can leave no doubt that the plaintiff made every reasonable effort to persuade his wife to continue the marital relationship and met with opposition from her at every turn.

The wife deserted the husband and persisted in that desertion for a period of more than two years. At no time during that period did she make a bona fide offer to return to him.

The appellant objects to the lower court's allowance of an amendment to the plaintiff's complaint changing the date of desertion from March 17, 1951 to May 13, 1951 so that the pleading might conform to the evidence.

Allowance of the amendment was proper. See Rule of Civil Procedure 1033 and *McGregor Est. v. Young Twp.*, 350 Pa. 93, 111, 38 A. 2d 313 (1944).

Decree affirmed.